

# THE ATTORNEY GENERAL
## OF TEXAS

Gerald C. Mann

AUSTIN 11, TEXAS

~~XXXXXXXXXXXXXXXXX~~
ATTORNEY GENERAL

Hon. Henry C. Kyle
County Attorney
Hays County
San Marcos, Texas

Opinion No. O-5338
Re: Is it lawful for Hays County to pay principal and interest due on road and bridge fund indebtedness with receipts from motor vehicle registration license fees and use money collected from the levy of the road and bridge constitutional 15¢ tax, which has been pledged for retirement of said principal and interest, to pay the salaries of the county commissioners and a part of the ex officio salary of the county judge, and is Article 2350(1), Vernon's Annotated Civil Statutes, constitutional to the extent of allowing payment of the salaries of county commissioners and a part of the ex officio salary of the county judge out of any fund derived from the 15¢ constitutional tax levy for roads and bridges?

Dear Sir:

Your request for an opinion on the above matters has been received and carefully considered. We quote from your request as follows:

"The receipts of the Hays County road and bridge fund are derived from the Constitutional 15¢ levy as provided in Art. VIII, Sec. 9 (the additional 15¢ tax for that fund has never been voted); motor vehicle registration fees; fines and forfeitures; and, state aid for retirement of certain indebtedness and payment of interest. All of the 15¢ levy has been heretofore pledged by the Commissioners Court for the payment of principal and interest on outstanding road and bridge fund amortized indebtedness. All of the said State aid is applied as required by law. The entire salary of each County Commissioner and a part of the ex-officio salary of the County Judge are paid from the road and bridge fund as is presumably allowed under certain circumstances by Art. 2350(1) of V.A.C.S. where the entire levy of 25¢ is made for the general fund. Such salaries paid from the road and bridge fund do not exceed the income from the 15¢ constitutional tax levy for roads and bridges. The other income of the road and bridge fund, exclusive of automobile registration fees, state aid and the said 15¢ levy, is not sufficient to pay such salaries.

Although the entire said 15¢ levy has heretofore been pledged, as stated above, it is contended by the Commissioners Court and the County Auditor of Hays County that it is impossible to say that any salaries are paid from motor vehicle registration fees, because all the funds are in one 'pot', so to speak; that such salaries are coming out of the said Constitutional 15¢ levy and other revenues of the road and bridge fund besides the motor vehicle registration fees and state aid; and, that Art. 6675a-10 specifically provides that motor vehicle registration fees may be used in payment of principal and interest on obligations issued in construction and improvement of county roads.

". . . ."

In reply to our request for additional information relative to said matters, you state that Hays County does levy the entire sum of 25¢ provided for the general fund; that all the taxes levied for retirement of indebtedness are put into the road and bridge fund without setting up a fund for any bond or warrant issue and that whatever amount is due at the various dates is simply paid by a warrant on the road and bridge fund. You also state that the salaries of the county commissioners and a part of the ex officio salary of the county judge are paid from the road and bridge fund, and that the commissioners' court and the county auditor contend that these salaries come out of the 15¢ constitutional road and bridge fund tax, which has been pledged to pay the indebtedness referred to, since the motor vehicle registration fees are used to pay what said 15¢ tax has been pledged to pay, and you ask whether Article 2350(1) of Vernon's Annotated Civil Statutes, is constitutional insofar as it permits the payment of said salaries from the proceeds of said 15¢ road and bridge fund tax.

Article 6675a-10 of Vernon's Annotated Civil Statutes, which provides for the apportionment of funds collected by county tax collectors from motor vehicle registration fees, is in part as follows:

"On Monday of each week each County Tax Collector shall deposit in the County Depository of his county to the credit of the County Road and Bridge Fund an amount equal to one hundred (100%) per cent of net collections made hereunder during the preceding week until the amount so deposited shall have reached a total sum of Fifty Thousand ($50,000.00) Dollars.

"Thereafter, and until the amount so deposited for the year shall have reached a total of One Hundred Seventy-five

Thousand ($175,000.00) Dollars he shall deposit to the credit of said Fund on Monday of each week an amount equal to fifty (50%) percent of collections made hereunder during the preceding week.

" . . . .

" . . . . None of the monies so placed to the credit of the Road and Bridge Fund of a county shall be used to pay the salary or compensation of any County Judge or County Commissioner, but all said monies shall be used for the construction and maintenance of lateral roads in such county under the supervision of the County Engineer, if there be one, and if there is no such engineer, then the County Commissioners' Court shall have authority to command the services of the Division Engineer of the State Highway Department for the purpose of supervising the construction and surveying of lateral roads in their respective counties. All funds allocated in the counties by the provisions of this Act (Arts. 6675a-1 to 6675a-14; P.C. Art. 807a) may be used by the counties in the payment of obligations, if any, issued and incurred in the construction or the improvement of all roads, including State Highways of such counties and districts therein; or the improvement of the roads comprising the County Road system."

It is the opinion of this department that, under the provisions of said quoted statute, funds received from motor vehicle registration fees could be used in the payment of obligations issued and incurred in the construction or improvement of all roads in Hays County, including State highways and districts, as well as any roads comprising a county road system, which would evidently include all of the indebtedness referred to by you, but for the following reasons:

Payment of all of said indebtedness has already been arranged for as provided by law, in that the 15¢ road and bridge fund tax set out in the Constitution and statutes has been set aside for that purpose and, under the laws of Texas, the funds raised by the levy of said 15¢ tax cannot be used for any other purpose. This rule of law was laid down by the Supreme Court in the case of Carroll v. Williams, 202 S.W. 504. There was involved in this case the authority of the commissioners' court of Jefferson County, as part of a general scheme for exacting from taxpayers and expending on roads and bridges of the county more money than the Constitution of this State permitted to be raised by taxation and expended for that purpose, deliberately and purposely levied, for various other purposes defined by said Constitution, taxes which were known by that court, at the time of such levies thereof, to be much greater in amounts than

were required to meet the current expenditures for such other purposes, and afterwards transferred such excesses in such fund to the road and bridge fund, and expended same accordingly. In holding that said court did not have such authority, the Supreme Court made the following holdings that are applicable here:

"Going to the real gist of the main issue before us, section 9 of article 8 of our state Constitution, supra, inhibits any and all transfers of tax money from one to another of the several classes of funds therein authorized, and, as a sequence, the expenditure, for one purpose therein defined, of tax money raised ostensibly for another such purpose. The immediate purpose in so prescribing a separate maximum tax rate for each of the classes of purposes there enumerated is, no doubt, to limit, accordingly, the amount of taxes which may be raised from the people, by taxation, decl aredly for those several purposes or classes of purposes, respectively. But that is not all. The ultimate and practical and obvious design and purpose and legal effect is to inhibit excessive expenditures for any such purpose or class of purposes. By necessary implication said provisions of section 9 of article 8 were designed, not merely to limit the tax rate for certain therein designated purposes, but to require that any and all money raised by taxation for any such purpose shall be applied, faithfully, to that particular purpose, as needed therefor, and not to any other purpose or use whatsoever. Those constitutional provisions control, not only the raising, but also, the application of all such funds; . . .

"True, the Constitution does not say, in so many words, that money raised by a county, city or town, by taxation for one such purpose shall never be expended for any other purpose--not even for another of the five general classes of purposes defined and approved in said section 9--but that, we think, is its plain and certain meaning and legal effect. The very definitions of those several classes of purposes, and the declaration of authority to tax the people therefor, respectively, coupled, as they are, in each instance, with a limitation of the tax rate for that class, must have been predicated upon the expectation and intent that, as a matter of common honesty and fair dealing, tax money taken from the people ostensibly for one such specified purpose shall be expended, as needed, for that purpose alone, as well as that the tax rate for that particular class, in any one year, shall not exceed the prescribed maximum.

". . . .

"Under a Constitution which designated certain specific funds for counties, cities, and towns, and fixes a different maximum tax rate for each such fund, why should the local governing body be permitted to expend for one such purpose money raised by taxation under an entirely different grant of power and for an essentially different constitutional purpose? That, it seems to us, would not conserve any sound public policy.

"No implied power to transfer money from one to another such constitutional fund is derived from the fact that the original fund contains more than enough to meet the current demands against it. Such excess may be retained in that fund, and applied in succeeding years to the very purpose for which it was raised, thereby possibly reducing the future tax rate for that purpose.

"Nor is the asserted power to transfer money from one to another such fund aided, even to the slightest extent, by the circumstance that any particular levy of taxes for the benefit of the specific fund which would be augmented by such transfer was made at a rate less than the maximum rate permitted by the Constitution, or even, as in the case at bar, at a rate less than that authorized at a referendum election. The power to tax, up to the authorized maximum, but separately for each such purpose, is conferred, and exists, and may be exercised freely, without regard to the existence or nonexistence of the asserted power to transfer, under any circumstances, the proceeds of such taxation, or any portion thereof, from one to another such fund. But, on the other hand, said asserted power of transfer of tax money from one to another such fund, and the consequent expenditure thereof for a purpose essentially different from that for which, ostensibly, it was taken from that taxpayer, effectually is inhibited and nullified, in law, by reason of the fact that our Constitution itself--to say nothing of our statutes--specifically has designated and permitted the creation of each such separate fund, and for each expressly and specifically has prescribed a separate maximum tax rate. Utterly and radically at variance with those provisions is the whole conception of a transfer of money from one to another such fund, and its consequent application accordingly.

Under these rules of law, the funds collected by Hays County by means of the 15¢ constitutional tax levy for the purpose of paying the principal and interest on outstanding road and bridge fund indebtedness cannot be used for any other purpose and, the funds so collected being sufficient to take care of said indebtedness, the funds received from motor vehicle registration

fees cannot be used to pay said indebtedness. It is clear from the provisions of Article 6675a-10, that said motor vehicle registration fees cannot be used to pay any of the salaries of county commissioners or county judge.

In determining whether or not Article 2350(1), which provides that as much as 75% of the salaries of the county judge and all of the salaries of the county commissioners may, at the discretion of the commissioners' court, be paid from the road and bridge fund in counties where the constitutional limit of 25¢ on the $100.00 is levied for general purposes, is constitutional, the rules of law laid down by the Supreme Court in the case of Carroll v. Williams, supra, must be applied, and no funds over and above those authorized by the Constitution may be used to pay said salaries.

In the case of Tinner v. Crow, et al., 78 S.W.(2d) 588, Com.App., there was involved the constitutionality of Section 8a, Special Laws 1919, 2nd Called Session, page 16, Chapter 7, authorizing the members of the commissioners' court and county judge of Hill County to use their automobiles in the performance of their duties as set out in a bill theretofore passed at the regular session of said Legislature providing for a more efficient road system in Hill County, and that all of the expenses of said automobiles should be paid by the county out of the road and bridge fund. Said law was upheld on the ground that the use by the commissioners of their private automobiles clearly had to do with the maintenance of the public roads of the county, and if so, the Legislature had the authority under the Constitution to authorize the use of a part of the road and bridge fund to accomplish this purpose. Applying this reasoning to the question here under consideration, it is evidently necessary for someone to have charge of and administer the road and bridge fund and to perform various services in connection therewith which would have to do with the maintenance of the public road system of Hays County, therefore, it is proper that compensation for such services should be paid from the road and bridge fund, though, ordinarily, all salaries should be paid from the general fund.

The case of Underwood v. Howard, County Judge, et al., 1 S.W.(2d) 730, writ dismissed, deals with a contract entered into by the commissioners' court of Childress County for the making of an abstract covering delinquent taxes and, in complying with said contract, said commissioners' court issued various warrants which were to be paid in part from delinquent taxes as collected over a certain period of time, except county general fund delinquent taxes, and in part from delinquent taxes collected for the general county fund. In holding that the warrants first above referred to could not be thus paid, the court held as follows:

"The commissioners' court was not authorized to contract for the payment of the $500 warrants aggregating not to exceed $16,000, with interest thereon, out of all the delinquent taxes collected, except the portion of said delinquent taxes belonging to the general fund of the county, as this was obviously an attempt to appropriate the state taxes, the jury fund, the road and bridge fund, and any improvement fund included in said delinquent taxes to the discharge of an obligation payable only out of the general fund.  Carroll v. Williams, 109 Tex. 155, 202 S.W. 504; Commissioners' Court of Henderson County v. Burke, (Tex.Civ.App.) 262 S.W. 94; Wallace et al. v. Commissioners' Court of Madison County et al. (Tex.Civ.App. 281 S.W. 593.

"We are not to be understood, however, as holding that said warrants issued for the payment of the making of the abstract of the property of Childress county are null and void, but our conclusion is that the commissioners' court was without authority to set aside and place in a separate fund, for the payment of said warrants, all the delinquent taxes collected, belonging to said several constitutional funds, except that portion  thereof belonging to the general fund.  Austin Bros. v. Patton et al.  (Tex. Com.App.) 288 S.W. 182."

Another case applying the rule of law that funds levied and collected for certain purposes cannot be transferred to some other fund and used for some other purpose is that of Jefferson Iron Company et al. v. Hart, Tax Collector, 45 S.W. 321.  The facts of this case were that the commissioners' court had levied a tax for county purposes for the full limit allowed by law. In addition thereto, it had levied a tax for courthouse repairs when no such repairs were to be made, the real purpose and intention of levying said tax for courthouse repairs being to raise an additional fund for general county purposes.  In holding such levy for courthouse repairs invalid, the court held as follows:

"The case of Railroad Co. v. Dawson Co., 12 Neb. 255, 11 N.W. 307, was a suit by injunction to restrain the collection of a sinking-fund tax.  It appeared that large sums collected for the sinking-fund tax for the three previous years had been transferred to the county general fund. The court in that cases uses the following language:  'The limitation upon the rate of taxation is for the protection of the taxpayers, and to secure economy in the expenditure of public moneys.  It is the evident intention of the law that only the amount required in any particular fund shall be levied, and no more.  If the law limits the levy for the ordinary county revenue to ten mills on the dollar valuation, no greater sum can be raised for that purpose by

levying more than is required for a sinking fund, or any
other tax, and then transferring the surplus to the gen-
eral fund. If the law could be thus evaded, it would
afford no protection to taxpayers whatever.' See, also,
Vanover v. Davis, 27 Ga. 355; State v. Commissioners of
Marion Co., 21 Kan. 419; Bank v. Barber, 24 Kan. 534;
Desty, Tax'n, 1059; Cooley, Tax'n (2d Ed.) 277. In this
case it appears that for the past eight years a tax for
court-house repairs has been levied and collected, and
appropriated for county purposes. The petition alleges,
in effect, that there is no necessity for this tax; that
it is levied for the purpose of, and with the intention
of, using the fund arising therefrom for the payment of
current expenses of said county, and not for the purpose
of repairing the court house and jail. These allegations
are sustained by the findings of the trial court. Under
these facts, if the tax for the 'courthouse repair' is
sustained, it in effect renders nugatory the limitation
in the constitution prohibiting a county from levying a
tax in excess of 25 cents on each $100 valuation of the
property for county purposes. This provision of the
constitution cannot be defeated in this indirect manner.
If this were a case in which the commissioners' court was
exercising its discretion as a court in the levy of a tax,
we would not feel authorized in interfering with its dis-
cretion. The record presents a case in which the commis-
sioners' court, after having levied a tax for county pur-
poses to the full limit authorized by the constitution,
has made an additional levy for the purported purpose of
court house repairs, when the real purpose and intention
is to raise a fund for general county purposes. This
seems a means adopted to defeat the limitation on taxation
for county purposes imposed by the constitution. . . ."

Applying these well settled rules of law to the ques-
tion of whether or not salaries of county commissioners and
county judges can be paid from the road and bridge fund, it is
clear that funds levied and collected for the road and bridge
fund must be used for road and bridge purposes, and that no
part of such funds can be used to pay the salaries of county
commissioners or county judges, unless such payments be in pay-
ment for services performed in the maintenance of the public
road system. It is our opinion, therefore, that the salaries
of the county commissioners of Hays County can be paid from
the road and bridge fund insofar as the funds so used are in
payment for services performed in the maintenance of the public
road system of Hays County, but that any salaries paid other-
wise would be, in effect, taking the funds belonging to the road
and bridge fund and appropriating same to the discharge of ob-
ligations payable only out of the general fund, thereby defeating

the limitation of taxation for county purposes imposed by the Constitution. This holding would also apply to the county judge of Hays County but for the fact that Article 2350(1), insofar as it applies to a county judge, is, in our opinion, of no effect, for the following reasons:

Article 2350 was passed originally in 1925. It has been amended several times since then, but until the last amendment in 1935 by which what is now Article 2350(1) was added, it had covered only salaries of county commissioners. In this last amendment, salaries of county judges of certain counties are mentioned for the first time, and provision is made therein that as much as 75% of the salary of the county judge may, at the discretion of the commissioners' court, be paid from the road and bridge fund in counties where the constitutional limit of 25¢ on the $100.00 is levied for the general fund. However, the caption of the bill by which this amendment was made makes no reference to the fact that the salaries of county judges are to be affected thereby, said caption being as follows:

"An Act to amend Article 2350, Title 44, Revised Civil Statutes of the State of Texas, 1925, as amended by the Acts of the Thirty-ninth Legislature, Regular Session, Chapter 135, Section 1; and as amended by Act of the Fortieth Legislature, page 435, Chapter 290, Section 1; and as amended by Act of the Fortieth Legislature, First Called Session, page 138, Chapter 46, Section 1; and as amended by Act of the Forty-third Legislature, Regular Session, Chapter 216; and as amended by Act of the Forty-third Legislature, First Called Session, Chapter 83, page 220; and so as to provide the salaries of County Commissioners and Precinct Commissioners in certain counties; providing that all laws or parts of laws in conflict with this Act are hereby expressly repealed; providing that if any part of this Act be declared unconstitutional it shall not affect any remaining part; and declaring an emergency." (Ch. 362, p. 1036, Regl. Session, 44th Legislature, 1935.)

Article III, Section 35, of the Constitution is as follows:

"No bill, (except general appropriation bills, which may embrace the various subjects and accounts, for and as on account of which moneys are appropriated) shall contain more than one subject, which shall be expressed in its title. But if any subject shall be embraced in an act, which shall not be expressed in the title, such act shall be void only as to so much thereof, as shall not be so expressed."

The general rule of construction of this Article and Section of the Constitution, as applied to amendments, is laid

down in 39 Tex.Jur., Sec. 48, pages 102-104, in the following language:

"48.   Amendatory Acts. -- The title of an amendatory act is ordinarily sufficient to allow any amendment germane to the subject of the original statute, if it properly specifies the chapter and section, or the revision and article, to be amended.  When the title of the original act is sufficient to embrace the matters covered by the provisions of the amendatory act, the title of the latter act is not required to state the subject of the law amended or to specify the nature of the proposed amendment.  But new substantive matter contained in an amendment, which is not germane to or pertinent to that contained in the provision amended, is invalid as legislation upon a latter not expressed in the title of the amendatory act.

"Specification of field of amendment.--In addition to the statement of a purpose to amend a given law or provision, a title may specify the nature of the amendment, and when it does so the body of the act must conform.  A title that specifies the particular field an amendment is to cover or states a purpose to make a certain change in the prior law, and that is not merely descriptive of the matters to which the law relates, limits the amendatory act to the making of the change designated and precludes any additional, contrary or different amendment.  Thus a title that expresses a purpose to change a prior law by adding or extending a provisions or conferring a right does not warrant an amendment that omits or restricts a provision of the original act or destroys a previously existing right.  Similarly a title expressing a purpose to change a definition does not authorize a change of penalty.  Nor does a title expressing a purpose to change a penalty authorize a change of definition.  And where a title names as the purpose of the act the amendment of specified sections of a former law, the body of the act, after amending such sections, may not proceed to set out other sections which would become a part of the original act but which are not included in the title by reason of being changes in, or enlargements of, the sections specified thereon."

Applying this rule of law to the amendment of Article 2350 passed in 1935 and known as Article 2350(1), and it being clear that the caption of said bill did not contain any reference to the fact that said bill was intended to make it possible for as much as 75% of the salaries of county judges to be paid from the road and bridge fund in counties where the constitutional limit of 25¢ on the $100.00 is levied for the general fund, there is no question but that said amendment, insofar as the salaries

of county judges is concerned, is unconstitutional and void, and we so hold.

For your information relative to the proper handling of the various funds referred to, we hand you herewith a copy of our Opinion No. O-2942. We also refer you to Article 839 of the Revised Civil Statutes of Texas, which reads as follows:

"No city or county treasurer shall honor any draft upon the interest and sinking fund provided for any of the bonds of such city or county, nor pay out nor divert any of the same, except for the purpose of paying the interest on such bonds or for the redeeming the same, or for investment in such securities as may be provided by law. Acts 1899, p. 45."

We think the fund derived from the 15¢ constitutional road and bridge fund levy should be placed in interest and sinking funds for the purpose of paying the indebtedness referred to, each of said interest and sinking funds to be kept separate from the others, as well as separate from the road and bridge fund used for other purposes. Since it takes all of the funds derived from said 15¢ constitutional road and bridge fund levy to pay said indebtedness, there would be no funds to place in the regular road and bridge fund, except such funds as may be received from other sources.

We are returning to you herewith the audit report of Hays County for 1942. Trusting that this satisfactorily answers your inquiry, we are

Very truly yours

ATTORNEY GENERAL OF TEXAS

By /s/ Jas. W. Bassett
Jas. W. Bassett, Assistant

APPROVED JUL 19, 1943
/s/ Grover Sellers
FIRST ASSISTANT ATTORNEY GENERAL

APPROVED: OPINION COMMITTEE
BY:      BWB, CHAIRMAN

JWB:db:wb

Enclosures